03-CV-03682-CMP

_____ FILED _____ ENTERED
_____ LODGED_____ RECEIVED

**NOV 2 5 2003**   KN

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE**

SOCIETY OF PROFESSIONAL
ENGINEERING
EMPLOYEES IN AEROSPACE –
IFPTE LOCAL 2001,

    Plaintiff,

  v.

THE BOEING COMPANY,

    Defendant.

**C03-3682C**

**COMPLAINT TO COMPEL**
**ARBITRATION**

**JURISDICTION AND VENUE**

1. This is an action brought pursuant to Section 301 of the National Labor Relations Act, as amended (hereafter "the Act"), 29 U.S.C. § 185. Jurisdiction and venue are conferred upon this Court by Section 301(a) of the Act, 29 U.S.C. § 185(a).

**PARTIES**

2. Plaintiff Society of Professional Engineering Employees in Aerospace - IFPTE Local 2001 ("Union") is a labor organization as that term is defined in Section 2(5) of the Act, 29 U.S.C. § 152(5). The Union is the collective bargaining representative of certain of defendant The Boeing Company's employees.

COMPLAINT TO COMPEL ARBITRATION - 1

LAW OFFICES OF
RINEHART & ROBBLEE

1620 METROPOLITAN PARK BUILDING
1100 OLIVE WAY • SEATTLE, WA 98101
(206) 467-6700 • FAX 467-7589

3       Defendant The Boeing Company (the "Company") is an employer within the meaning of Section 2(2) of the Act, 29 U.S.C. § 152(2). The Company conducts business in Seattle, Washington, within this district.

## CLAIM FOR RELIEF

4.      Plaintiff incorporates by reference as though set forth fully herein paragraphs 1 through 3 above.

5.      The Union and Company have been at all times relevant to this matter parties to and bound by two written collective bargaining agreements, governing the wages, hours and other terms and conditions of employment of certain employees of the Company. One Agreement covers technical employees ("Technical Agreement") and the other covers professional engineering employees ("Professional Agreement"). When this dispute first arose the Agreements were effective by their terms from March 20, 2000 to December 1, 2002. True and correct copies of relevant portions of those Technical and Professional Agreements are attached hereto as Exhibits A and B, respectively, and are fully incorporated herein by this reference.

6.      Article 3 of each of the Agreements governs the manner in which grievances between the Union and Company will be resolved.

6.1     Section 3.1 provides:

> Grievances arising between the Company and its employees subject to this Agreement, or between the Company and the Union, with respect to the interpretation or application of any of the terms of this Agreement shall be settled according to the following procedure.

6.2     Section 3.3 provides for the handling of grievances by the Union against the Company to matters dealing with the interpretation or application of the Agreements and ultimately if the parties cannot reach agreement, for submission to an arbitrator as provided for in Sections 3.4 through 3.6 of the Agreements.

6.3     Sections 3.4 through 3.6 provide that the Company and the Union will select an arbitrator off an agreed to list. The arbitrator will hear the case and accept pertinent

LAW OFFICES OF
RINEHART & ROBBLEE

1620 METROPOLITAN PARK BUILDING
1100 OLIVE WAY • SEATTLE, WA 98101
(206) 467-6700 • FAX 467-7589

evidence and rule on the basis of the evidence presented at hearing and render a final and binding decision.

7. On March 5, 2001, pursuant to Article 3, Section 3(2)(a) of the Agreements, the Union filed written Step 3 grievances alleging that Boeing was violating Article 1 of the Professional and Technical Agreements by failing to cover employees traditionally covered by those agreements under the terms and conditions of those agreements. A true and correct copy of the Union's letter is attached hereto as Exhibit C and incorporated herein by reference.

8. In a letter dated June 4, 2003, because there was a dispute between the parties over the interpretation or application of terms of the Agreements based on the Union's belief that the Company was refusing to cover employees who fit within the description of employees who are to be covered by the Agreements in Article 1 and other relevant portions of the Agreements, the Union submitted that dispute under the agreed procedure for resolving such disputes under Article 3, Section 3.3 of the Agreements, by filing with the Company a written request for arbitration. A true and correct copy of the Union's letter is attached hereto as Exhibit D and is fully incorporated herein by this reference.

9. By letter dated June 19, 2003, the Company denied the Union's request for arbitration, on the basis that the dispute was a matter concerning representation and within the jurisdiction of the National Labor Relations Board. A true and correct copy the Company's letter is attached hereto as Exhibit E and is fully incorporated herein by this reference. At all times since, the Company has refused to submit the parties' dispute over the interpretation or application of terms of the Agreements to the agreed upon procedure for resolving such disputes, namely final and binding arbitration.

11. The Company's failure and refusal to submit the parties' dispute to final and binding arbitration violates the Agreements and is without legal justification.

WHEREFORE, plaintiff demands judgment against the defendant:

COMPLAINT TO COMPEL ARBITRATION - 3

1.   Ordering the defendant to submit the parties' dispute over the interpretation or application of terms of the Agreements as applied to its employees employed in Palmdale and Edwards Air Force Base to the Agreements' final and binding arbitration provisions.

2.   Requiring defendant to pay to plaintiff's reasonable attorneys' fees and the costs of this action.

3.   Granting plaintiff such other and further relief as the Court deems just and proper.

DATED this 25th day of November, 2003.

GENERAL COUNSEL, SOCIETY
OF PROFESSIONAL ENGINEERING
EMPLOYEES IN AEROSPACE


PHYLLIS ROGERS, WSBA #24858
15205 52nd Avenue South
Seattle, WA 98188


RINEHART & ROBBLEE


MARK E. BRENNAN, WSBA #8389
Attorneys for Plaintiff Society Professional
Engineering Employees in Aerospace

draftcomplaint.doc

LAW OFFICES OF
RINEHART & ROBBLEE

1620 METROPOLITAN PARK BUILDING
1100 OLIVE WAY • SEATTLE, WA 98101
(206) 467-6700 • FAX 467-7589

**Technical Contract**

**1999 - 2002**

**Collective Bargaining Agreement**

between The Boeing Company and
Society of Professional Engineering Employees in Aerospace

Society of Professional Engineering
Employees in Aerospace
15205-52nd Avenue South
Seattle, Washington 98188

EXHIBIT A

# COLLECTIVE BARGAINING AGREEMENT

Between

## THE BOEING COMPANY

and

## SOCIETY of PROFESSIONAL ENGINEERING EMPLOYEES in AEROSPACE

*(Technical Bargaining Units)*

**Effective Date: March 20, 2000**

| | | Page |
|---|---|---|
| Attachment 22 | Salaried Job Classification System Conversion Appeals Process | 66 |
| Attachment 23 | Implementation of the Salaried Job Classification System | 67 |
| Attachment 24 | Sharevalue Program | 68 |
| Attachment 25 | Virtual Office/Telecommuting | 69 |
| Attachment 26 | Travel Card Process | 69 |
| Attachment 27 | Frequent Flier Mileage | 70 |
| Attachment 28 | SPEEA Access to the Boeing Web | 71 |
| Attachment 29 | Salary Review Consideration upon Return from Leave of Absence | 72 |
| Attachment 30 | Vote on Agency Fee Provision | 72 |
| Attachment 31 | Working Together Partnership | 72 |
| Attachment 32 | Ratification Bonus | 76 |
| Attachment 33 | Airplane Delivery Bonuses | 76 |
| Attachment 34 | Minimum Rates | 77 |
| Attachment 35 | Retraining Skill Transition | 77 |
| Attachment 36 | Promotions | 78 |
| Attachment 37 | AOG Assignments | 78 |
| Attachment 38 | Technical Excellence Program | 79 |
| | | 80 |
| Attachment A | Group Benefits Package | A-1 |
| Attachment B | Retiree Medical Plan | B-1 |
| | Index | I-1 |

# COLLECTIVE BARGAINING AGREEMENT

Between

THE BOEING COMPANY

and

# SOCIETY of PROFESSIONAL ENGINEERING EMPLOYEES in AEROSPACE

This Agreement is executed this 1st day of August, 2000, effective March 20, 2000, by and between The Boeing Company, a Delaware corporation having its principal place of business in Seattle, Washington (the "Company"), and Society of Professional Engineering Employees in Aerospace ("SPEEA" or the "Union"). The Union is the bargaining agent for the collective bargaining units described in Article 1 and the parties intend that this Agreement apply separately and respectively to each unit as if a separate Agreement had been executed as to each.

This agreement is a reflection of the parties' commitment to these shared values:

- To maintain a respectful, cooperative relationship.

- **To work together to further the mutual success of both parties:** positioning Boeing for continued competitive success in the marketplace while enabling SPEEA to best represent and serve its members.

- To resolve issues, to the greatest extent possible, through a collaborative process, marked by open communication and respect for each other's interests.

## ARTICLE 1
## RECOGNITION

**Section 1.1 Recognition.** For the purposes of collective bargaining with respect to rates of pay and other conditions of employment, the Company recognizes the Union as the exclusive bargaining agent for the collective bargaining units described as follows:

**1.1(a)** As defined by the Certification of Representative dated February 3, 1972, by the National Labor Relations Board in Case No. 19-RC-5993, those technical employees on the general office payroll of The Boeing Company working in the Company's plants in the State of Washington, including persons who are on travel status from such plants, who are classified by the Company in one of the job classifications listed in Appendix A attached hereto and including those persons assigned (other than on travel status) at Edwards AFB, California or Palmdale, California who are classified by the Company in one of the job classifications listed in Appendix A hereto, excluding guards and supervisors as defined in the National Labor Relations Act, employees in all other job classifications in the general office payroll, and all other employees.

**1.1(b)** All technical employees employed by The Boeing Company at its primary location at 19000 N.E. Sandy Boulevard, Portland, Oregon, as identified in the National Labor Relations Board Certification of Representative, dated August 7, 1981, in Case No. 36-RC-4471; excluding guards and supervisors as defined in the National Labor Relations Act and all other employees.

**1.1(c)** All employees of the Company assigned (other than on travel status) to the Inertial Upper Stage program at the Cape Canaveral Air Force Station, Florida who are classified by the Company in one of the job classifications listed in Appendix A hereto.

**Section 1.2 Employees.** For purposes of this Agreement, the term "employees" shall include only those persons referred to in 1.1.

1

## ARTICLE 2
## RIGHTS OF MANAGEMENT

### Section 2.1 Rights of Management.

2.1(a) The terms and conditions of this Agreement are minimum and the Company shall be free to grant more favorable terms and conditions and to pay salary rates higher than the salary ranges shown in Article 11 to any employee.

2.1(b) The management of the Company and the direction of the workforce are vested exclusively in the Company subject to the terms of this Agreement. Without limitation, implied or otherwise, all matters not specifically and expressly covered or treated by the language of this Agreement may be administered for its duration by the Company in accordance with such policy or procedure as the Company from time to time may determine.

## ARTICLE 3
## GRIEVANCE PROCEDURE AND ARBITRATION

### Section 3.1 Grievance and Arbitration Procedure.
Grievances arising between the Company and its employees subject to this Agreement, or between the Company and the Union, with respect to the interpretation or application of any of the terms of this Agreement shall be settled according to the following procedure. Subject to the terms of this Article relating to cases of dismissal or suspension for just cause, or of involuntary resignation, only matters dealing with the interpretation or application of terms of this Agreement shall be subject to this grievance machinery.

### Section 3.2 Employee Grievances.

3.2(a) Grievances on behalf of employees shall be handled as follows:

STEP 1. Oral Submission of Grievance to Supervisor. The employee and, at his or her option, a Union Representative shall contact the employee's supervisor and shall attempt to effect a settlement of the grievance. Such oral presentation shall be made within ten (10) workdays following the occurrence of the event giving rise to the grievance. The supervisor shall, within five (5) workdays thereafter, provide to the employee the answer to the grievance.

STEP 2. Oral Submission of Grievance to Major Organization Management. If the decision of the supervisor does not settle the grievance, the Union Representative shall within five (5) workdays subsequent to the receipt of the supervisor's answer contact the Human Resources Director, or designee, of the Major Organization in which the employee is assigned for the purpose of arranging a meeting to discuss the grievance. The meeting will be held within five (5) workdays following such request and shall be attended by the Union Representative and the employee and appropriate Company Representatives. The Company's answer to the grievance shall be made within ten (10) workdays following such meeting.

STEP 3. Written Submission of Grievance to Company Representative. If no settlement is reached, the Union Representative may immediately thereafter reduce a statement of the grievance to writing, which shall contain the following:

(a) The detailed facts upon which the grievance is based.

(b) References to the section(s) of the Agreement alleged to have been violated. (This will not be applicable in cases of dismissal or suspension for just cause, or of involuntary resignation.)

(c) The remedy sought.

The Union Representative shall submit such written grievance to the designated Company Representative within five (5) workdays following receipt of the answer provided in Step 2 above. After such submission the designated Company Representative and the Union Representative may, within the next ten (10) workdays, meet and settle the grievance, and over their signatures indicate the disposition thereof. Otherwise, promptly after the expiration of such ten (10) day period, they shall sign the grievance indicating that the grievance has been discussed and reconsidered by them and that no settlement has been reached, and the designated Company Representative will promptly thereafter confirm in writing to the Union Representative the denial of the grievance.

STEP 4. Arbitration. If no settlement is reached in Step 3 within the specified or agreed time limits, then either party may in writing, within ten (10) workdays thereafter, request that the matter be submitted to an arbiter for a prompt hearing as provided in 3.4 through 3.6.

3.2(b) Employees shall not be discharged or suspended without just cause. An employee shall have the right to appeal a layoff, discharge, suspension, or involuntary resignation by filing a written grievance through the Union, beginning at Step 3, with the designated Company Representative within ten (10) workdays after the date of such layoff, discharge, suspension, or involuntary resignation.

3.2(c) When the Union requests arbitration on behalf of bargaining unit employees who have been laid off, discharged, or suspended, or who have involuntarily resigned, the Company and the Union will exercise reasonable efforts to have the arbitration hearing within ninety (90) days of the request for arbitration.

### Section 3.3 Union, Versus Company and Company Versus Union Grievances.
Grievances which the Union may have against the Company or the Company may have against the Union, limited as aforesaid to matters dealing with the interpretation or application of terms of this Agreement, shall be handled as follows:

3.3(a) Such grievances shall be submitted to the designated Company Representative or President of the Union, as the case may be, or to their designated representatives, within ten (10) workdays following the occurrence of the event giving rise to the grievance and shall contain the following:

(1) Statement of the grievance setting forth in detail the facts upon which the grievance is based.

(2) The section(s) of the Agreement alleged to have been violated.

(3) The remedy sought.

3.3(b) The grievance shall be signed by the President of the Union or the designated Company Representative, as the case may be, or their designated representatives. If no settlement is reached within ten (10) workdays from the submission of the grievance to the designated Company Representative or the designated representative of the Union, as the case may be, both shall sign the grievance and indicate it has been discussed and considered by them and that no settlement has been reached and the party responding to the grievance will promptly confirm in writing to the other party the denial of the grievance. Within ten (10) workdays thereafter either party may in writing request that the matter be submitted to an arbiter for a prompt hearing as provided in 3.4 through 3.6.

3.3(c) No matter shall be considered as a grievance under this 3.3 unless it is presented to the designated persons within ten (10) workdays after occurrence of the last event on which the grievance is based.

### Section 3.4 Selection of Arbiter - from Arbitration Panel.
Contemporaneously with execution of this Agreement, the parties will agree upon a panel of five arbiters. The panel may thereafter be augmented upon the mutual agreement of the parties. Selection of an arbiter to hear a particular case shall be made from the panel on a rotating, alphabetical basis.

as a concession or agreement that the grievance constitutes an arbitrable issue or is properly subject to the grievance machinery under the terms of this Article.

**Section 3.12  Jurisdictional Disputes.** Any disputes where the Union concedes, either (1) that work performed by represented employees not within one of the units described in Article 1 should be performed by employees within one of said units, or (2) that represented employees not within one of the units described in Article 1 should be included within one of said units, shall not be the subject to the grievance and arbitration provisions of Article 3. This Section 3.12 shall not apply to such disputes where the Union obtains the written consent of all other interested bargaining representatives to participate in and be bound by the decision of an arbitrator or panel of arbitrators.

## ARTICLE 4
## PERFORMANCE MANAGEMENT

**Section 4.1  Performance Management Process.** The Union and the Company agree that many factors contribute to performance, including but not limited to customer satisfaction, continuous quality improvement, initiative, productivity, technical competence, communication, teamwork, innovation/ creativity, integrity, and leadership. The Performance Management Process provides a continuous means for the employee and supervisor to assess performance; other means such as unit discussions, counseling and written comment also may be utilized. Performance problems warranting disciplinary action will be addressed through the established disciplinary process rather than through the Performance Management Process.

**4.1(a)** The Performance Management Process will be used by each employee and his or her supervisor, with the ultimate goal of improving individual and organization performance. Performance Management is designed to promote effective communication about performance and those factors that contribute to or are affected by performance, such as:

- job responsibilities;
- performance goals and expectations;
- an appraisal of performance, noting accomplishments and any areas requiring improvement;
- career development goals;
- the effect of performance on opportunities for selective salary adjustments;
- the effect of performance on retention index;
- any education and/or significant experience gained by the employee and related to his or her career progress within the Company;
- any other assignments, skills, or classifications where it is believed the employee may be particularly qualified;
- any unusual conditions that may impact work performance;
- and other factors relevant to assignment, performance, and contribution to the work effort.

In addition, the supervisor or the employee may initiate use of all or part of Skills and Attributes or, if they agree, Skills and Attributes may be omitted.

**4.1(b)** The Performance Management Process consists of three activities: define, develop, and review.

**4.1(b)(1)** "Define" consists of communication and documentation of current job responsibilities, performance goals, personal development goals, and the other subjects listed above as applicable. Define activities will be completed within forty-five calendar days of the beginning of the annual Performance Management cycle.

**4.1(b)(2)** "Develop" consists of ongoing communication and assessment of previously defined job responsibilities, goals, measures and action plans; results are to be examined and methods reviewed.

5

---

**Section 3.5  Selection of Arbiter - by Agreement.** Nothing in Section 3.4 shall preclude the parties from mutually agreeing on an arbiter to hear and decide a particular case.

**Section 3.6  Arbitration - Rules of Procedure.** Arbitration proceedings shall be in accordance with the following:

**3.6(a)** The arbiter shall hear and accept pertinent evidence submitted by both parties and shall be empowered to request such data as the arbiter deems pertinent to the grievance and shall render a decision in writing to both parties within sixty (60) days (unless mutually extended) of the completion of the hearing.

**3.6(b)** The arbiter shall be authorized to rule and issue a decision in writing on the issue presented for arbitration, which decision shall be final and binding on both parties.

**3.6(c)** The arbiter shall rule only on the basis of information presented in the hearing and shall refuse to receive any information after the hearing except where there is mutual agreement, in the presence of both parties.

**3.6(d)** Each party to the proceedings may call such witnesses as may be necessary in the order in which their testimony is to be heard. Such testimony shall be limited to the matters set forth in the written statement of the grievance. The arguments of the parties may be supported by oral comment and rebuttal. Either or both parties may submit written briefs within a time period mutually agreed upon. Such arguments of the parties, whether oral or written, shall be confined to and directed at the matters set forth in the grievance.

**3.6(e)** Each party shall pay any compensation and expenses relating to its own witnesses or representatives.

**3.6(f)** The Company and the Union shall, by mutual consent, fix the amount of compensation to be paid for the services of the arbiter. The Union or the Company, whichever is ruled against by the arbiter, shall pay the compensation of the arbiter including necessary expenses.

**3.6(g)** The total cost of the stenographic record, if requested, will be paid by the party requesting it. If the other party also requests a copy, that party will pay one-half of the stenographic costs.

**Section 3.7  Binding Effect of Award.** All decisions arrived at under the provisions of this Article by the representatives of the Company and the Union, or by the arbiter, shall be final and binding upon both parties, provided that in arriving at such decisions neither of the parties nor the arbiter shall have the authority to alter this Agreement in whole or in part.

**Section 3.8  Time Limitation as to Back Pay.** Grievance claims regarding retroactive compensation shall be limited to thirty (30) calendar days prior to the written submission of the grievance to Company Representatives, provided, however, that this thirty (30) day limitation may be waived by mutual consent of the parties.

**Section 3.9  Extension of Time Limits by Agreement.** The time limits set forth in this Article are recognized by the parties as being necessary for prompt resolution of grievances. Reasonable extensions of these time limits may be arranged by mutual written agreement. If a decision is not rendered by the Company within the time limits established for Steps 1 and 2, Section 3.2, the Union may thereupon advance the grievance to the next step. Grievances not presented, or presented and not pursued, within the specified or mutually extended time limits will be considered waived.

**Section 3.10  Conferences During Working Hours.** All conferences resulting form the application of provisions of this Article shall be held during working hours.

**Section 3.11  Signing Grievance Does Not Concede Arbitrable Issue.** The signing of any grievance by any employee or representative of either the Company or the Union shall not be construed by either party

4

**22.6(6) Additional Condition Applicable to In-Place Reclassifications to Lower Levels Only.**

**22.6(6)(1)** In-place reclassifications to lower levels shall not occur into the lowest authorized level of any job classification for which the lowest authorized level is level 1 or 4 if at least there levels are authorized for that job classification. The attached Appendix A, subject to revisions as provided in 22.4, shall be the exclusive reference for determining which levels are authorized.

**22.6(6)(2)** If an in-place reclassification to a lower level offer is made as a result of the removal of a portion of the assignment which previously justified the higher level, the employee and manager will define the revised assignment closing out the Performance Management plan and initiating a new plan in conjunction with the reclassification offer.

**22.6(6)c Employee Preference for Reclassification to a Lower Level.** The Company may, at its sole discretion, effect the reclassification to a lower level of any employee who expresses a preference for reclassification as an alternative to transfer or to discharge for a documented record of unacceptable performance. The provisions of 22.6(a)(1) through 22.6(a)(6), 22.6(a)(9), 22.6(b) and 8.2(e)(2) shall not apply to such cases.

## ARTICLE 23
## DURATION

**Section 23.1 Duration.**

**23.1(a)** This Agreement shall become effective March 20, 2000, and shall remain in full force and effect until the close of December 1, 2002, and shall be automatically renewed for consecutive periods of one year thereafter, unless either party shall notify the other in writing, at least sixty days and not more than ninety days prior to December 1 of any calendar year, beginning with 2002, of its desire either (1) to amend this Agreement, or (2) to terminate this Agreement as of a date stated in such notice to terminate, which date shall be subsequent to such December 1 provided that, in any event, this Agreement shall expire at the close of December 1, 2007.

**23.1(b)** If either a notice to amend or a notice to terminate is timely given pursuant to 23.1(a), the parties agree to meet within thirty days thereafter for the purpose of negotiating an amendment to this Agreement or a new contract.

**23.1(c)** If a notice to amend is timely given pursuant to (1) of 23.1(a), either party may at any time thereafter notify the other in writing of its desire to terminate this Agreement as of a date stated in such notice to terminate, which date shall be subsequent to December 1 of the year in which such notice to amend is timely given and at least sixty days subsequent to the giving of such notice to terminate.

**23.1(d)** This Agreement and any amendment thereof pursuant to this Article shall continue in full force and effect until either (1) a new contract superseding it is consummated, (2) it is terminated by a notice to terminate timely given pursuant to (2) of 23.1(a) or 23.1(c), or (3) it expires, whichever shall first occur.

Signed at Seattle, Washington, and dated this 1st day of August, 2000.

**Society of Professional Engineering Employees in Aerospace**

By _Craig Buckham_

President

**The Boeing Company**

By _Mary M. Stanger_

Director, Union Relations

42

---

## APPENDIX 4
## SPEEA JOB CLASSIFICATIONS

The job classifications include the major/minor function code, the job code, and the pay grade. The following table defines all of the existing major and minor function codes authorized for use. These codes form the first two characters of the job classification. The third and fourth characters of the job classification are shown in Table 2 that lists all authorized job codes and job titles installed effective with this agreement. The job code table identifies the authorized grade levels for each job code.

| XX Major/Minor Function | XX Job Code | XX Pay Grade |
|---|---|---|

## TABLE 1
## MAJOR/MINOR FUNCTION CODES

**Engineering – Major Function D & E**

| | |
|---|---|
| DD | Embedded Software |
| DF | Mechanical/Structural Design |
| DG | Electrical Wire Design |
| DH | Electrical Formboard Design |
| DJ | Electrical Diagrams/PWB Design |
| EA | Mechanical Technology |
| EB | Structural Technology |
| EC | Electronic/Electrical Technology |
| ED | Physics Technology |
| EE | Aeronautical Technology |
| EF | Flight Control Technology |
| EH | Weight Technology |
| EJ | Electronic/Electrical Design |
| EK | Payload Systems Design |
| EL | Structural Design |
| EM | Mechanical Design |
| EN | Noise Technology |
| EO | Configuration Development and Preliminary Design |
| EP | System Engineering |
| EQ | Product Assurance |
| ER | Biotechnology/Human Factors |
| ES | Laboratories |
| ET | Materials and Processes |
| EU | Propulsion Technology |
| EV | Liaison |
| EW | Flight Test |
| EX | Design Configuration Control |
| EZ | Engineering–Multifunction |
| E2 | Test Integration Planning |
| E3 | Test Operations/Conduct |
| E4 | Engineering Support |
| E5 | Propulsion Design |
| E6 | Drafting |
| E8 | Test Data Systems/Instrumentation |
| E9 | Test Support |

**Facilities – Major Function F**

| | |
|---|---|
| FF | Plant Layout |
| FH | Equipment Engineering |
| FI | Plant Engineering |

43

**Logistics – Major Function L**

1  LB  Spares Engineering
2  LC  Technical Publications/Logistic Data
3  LD  Field Service
4  LH  Logistics Equipment Design
5  LS  Customer Liaison–Spares
6  LT  Spares Support
9  LZ  Logistics–Multifunction

**Manufacturing – Major Function M & N**

10  MA  Industrial Engineering–Multifunction
11  MB  Scheduling
12  MD  Process Measurement and Labor Standard Development
13  MF  Method Technology
14  MG  Factory Load Control
15  MI  Manufacturing Engineering–Multifunction
16  MK  Production Control–Multifunction
17  MP  Manufacturing Support–Spares
18  MQ  Tool and Production Planning–Multifunction
19  MR  Project Planning
20  MS  Test Support
21  MT  Numerical Control
22  MU  Change Board Administration
23  MW  Tool Engineering–Multifunction
24  MX  Tool Design
25  M7  Tooling Master Layout (TMLO)
26  M1  Tool Liaison
27  M2  Tooling–Multifunction
28  M5  Plaster, Plastics, and Ceramic Tools
29  M6  Tool and Die
30  M7  Tool Services
31  M8  Tooling Assembly
32  M9  Tool Operations
33  NA  Manufacturing and Quality Research–Electrical/Electronics
34  NB  Fabrication–Multifunction
35  NC  Sheet Metal Fabrication
36  ND  Welding
37  NE  Machine Shop–Production
38  NF  Electrical Fabrication
39  NG  Assembly & Installation - Mechanical Structures
40  NH  Interiors-Fabrication-Assembly-Installation
41  NI  Human Factors
42  NK  Chemical Processing and Painting
43  NL  Metalbond, Plastic and Fiberglass Fabrication
44  NM  Heat Treat
45  NN  Quality Technology
46  NO  Product Development Support
47  NQ  Assembly–Multifunction
48  NR  Minor and Major Assembly
49  NS  Final Assembly/Installations
50  NT  Modification
51  NU  Equipment Design
52  NW  Preflight/Flight Test–Multifunction
53  NZ  Manufacturing–Multifunction
54  NI  Assembly & Installation - Systems
55  N3  Production Illustration

N5  Tooling Methods
N6  Engineering Experimental, Developmental and System Test Support
N7  Manufacturing Research and Development Techniques/Processes
N8  Chemical, Plastic, Composite and Ceramic Processes
N9  Tech Aide/Manufacturing Research and Development/Metals Technology

**Quality – Major Function Q**

Q2  Quality Analysis-Statistics
QA  Receiving and Shipping Inspection
QB  Manufacturing Support Inspection
QD  Laboratories–Quality
QE  Quality Control–Engineering
QF  Quality Control–Research and Development
QG  Source Quality Control
QH  Inspection and Test Planning
QJ  Electrical/Electronic
QK  Mechanical/Physical
QM  Metallurgical Processing
QN  Nondestructive Test Technology; Dye Penetrant and Magnetic Particle Test
QO  Chemical Processing
QP  Pyrometric
QR  Radiography Test
QU  Infrared Thermography and Photogrammetry Test
QV  Non-metallic Material
QX  Equipment Quality Analysis
QZ  Quality Control-Multifunction



## Professional Contract

### 1999 - 2002

## Collective Bargaining Agreement

between The Boeing Company and
Society of Professional Engineering Employees in Aerospace

*BOEING*

Presorted Standard
U.S. POSTAGE
**PAID**
SEATTLE, WA
PERMIT No. 4876

Society of Professional Engineering
Employees in Aerospace
15205-52nd Avenue South
Seattle, Washington  98188

EXHIBIT B



COLLECTIVE BARGAINING AGREEMENT

Between

THE BOEING COMPANY

and

SOCIETY of PROFESSIONAL ENGINEERING
EMPLOYEES in AEROSPACE
*(Professional Bargaining Units)*

**Effective Date March 20, 2000**

|  |  | Page |
|---|---|---|
| Attachment 22 | Salaried Job Classification System | 59 |
|  | Conversion Appeals Process |  |
| Attachment 23 | Implementation of the Salaried Job | 60 |
|  | Classification System |  |
| Attachment 24 | Sharevalue Program | 61 |
| Attachment 25 | Virtual Office/Telecommuting | 62 |
| Attachment 26 | Travel Card Process | 63 |
| Attachment 27 | Frequent Flier Mileage | 64 |
| Attachment 28 | SPEEA Access to the Boeing Web | 64 |
| Attachment 29 | Salary Review Consideration upon Return | 64 |
|  | from Leave of Absence | 65 |
| Attachment 30 | Vote on Agency Fee Provision | 65 |
| Attachment 31 | Working Together Partnership | 66 |
| Attachment 32 | Ratification Bonus | 69 |
| Attachment 33 | Airplane Delivery Bonuses | 69 |
| Attachment 34 | Minimum Rates | 70 |
| Attachment 35 | Retraining Skill Transition | 70 |
| Attachment 36 | Targeted Skills Fund | 71 |
| Attachment 37 | Use of Secondary Skill Codes | 71 |
| Attachment 38 | Unit Entries and Reclassifications | 72 |
| Attachment A | Group Benefits Package | A-1 |
| Attachment B | Retiree Medical Plan | B-1 |
| Index |  | I-1 |

COLLECTIVE BARGAINING AGREEMENT

Between

THE BOEING COMPANY
and
SOCIETY of PROFESSIONAL ENGINEERING EMPLOYEES in AEROSPACE

This Agreement is executed this 1st day of August, 2000, effective March 20, 2000, by and between The Boeing Company, a Delaware corporation having its principal place of business in Seattle, Washington (the "Company"), and Society of Professional Engineering Employees in Aerospace ("SPEEA" or the "Union"). The Union is the bargaining agent for the collective bargaining units described in Article I and the parties intend that this Agreement apply separately and respectively to each unit as if a separate Agreement had been executed as to each.

This agreement is a reflection of the parties' commitment to these shared values:

* To maintain a respectful, cooperative relationship.

* To work together to further the mutual success of both parties: positioning Boeing for continued competitive success in the marketplace while enabling SPEEA to best represent and serve its members.

* To resolve issues, to the greatest extent possible, through a collaborative process, marked by open communication and respect for each other's interests.

## ARTICLE I
## RECOGNITION

**Section 1.1 Recognition.** For the purposes of collective bargaining with respect to rates of pay and other conditions of employment, the Company recognizes the Union as the exclusive bargaining agent for the following collective bargaining units:

**1.1(a)** All persons working in the Company's plants in the State of Washington, including persons who are on travel status from such plants, who are classified by the Company in one of the classifications listed in Article 11 and including those persons assigned (other than on travel status) at Edwards AFB, California or Palmdale, California who are classified by the Company in one of the classifications listed in Article 11.

**1.1(b)** All employees of the Company working in the Company's plants located in Weber and Davis Counties, Utah, who are classified by the Company in one of the classifications listed in Article 11; excluding all other employees, guards and supervisors as defined in the National Labor Relations Act.

**1.1(c)** All employees of the Company working in the Company's plants at the Boeing Atlantic Test Center, Florida, who are classified by the Company in one of the classifications listed in Article 11; consistent with the Certification of Representative issued August 7, 1972, by the National Labor Relations Board in Case No. 12-RC-4117.

**1.1(d)** All employees of the Company working (other than on travel status) at the Company's Sandy Boulevard plant in Portland, Oregon who are classified by the Company in one of the classifications listed in Article 11; excluding all other employees, guards and supervisors as defined in the National Labor Relations Act.

**1.1(e)** All professional engineering employees in the Company's Facilities and Safety, Health and Environmental Affairs (SHEA) organizations in the greater Puget Sound region of Washington and in

Portland, Oregon; excluding all other professional employees employed in Facilities and SHFA, all guards and supervisors as defined by the National Labor Relations Act, and all other employees.

## ARTICLE 2
### RIGHTS OF MANAGEMENT

**Section 2.1  Rights of Management.**

**2.1(a)**  The terms and conditions of this Agreement are minimum and the Company shall be free to grant more favorable terms and conditions and to pay salary rates higher than the salary ranges shown in Article 11 to any engineering employee.

**2.1(b)**  The management of the Company and the direction of the workforce are vested exclusively in the Company subject to the terms of this Agreement. Without limitation, implied or otherwise, all matters not specifically and expressly covered or treated by the language of this Agreement may be administered by the Company in accordance with such policy or procedure as the Company from time to time may determine.

## ARTICLE 3
### GRIEVANCE PROCEDURE AND ARBITRATION

**Section 3.1  Grievance and Arbitration Procedure.**  Grievances arising between the Company and its employees subject to this Agreement, or between the Company and the Union, with respect to the interpretation or application of any of the terms of this Agreement shall be settled according to the following procedure. Subject to the terms of this Article relating to cases of dismissal or application of terms of cause, or of involuntary resignation, only matters dealing with the interpretation or application of terms of this Agreement shall be subject to this grievance machinery.

**Section 3.2  Employee Grievances.**

**3.2(a)**  Grievances on behalf of employees shall be handled as follows:

**STEP 1.  Oral Submission of Grievance to Supervisor.**  The employee and, at his or her option, a Union Representative shall contact the employee's supervisor and shall attempt to effect a settlement of the grievance. Such oral presentation shall be made within ten (10) workdays following the occurrence of the event giving rise to the grievance. The supervisor shall, within five (5) workdays thereafter, provide to the employee the answer to the grievance.

**STEP 2.  Oral Submission of Grievance to Major Organization Management.**  If the decision of the supervisor does not settle the grievance, the Union Representative shall within five (5) workdays subsequent to the receipt of the supervisor's answer contact the Human Resources Director, or designee, of the Major Organization in which the employee is assigned for the purpose of arranging a meeting to discuss the grievance. The meeting will be held within five (5) workdays following such request and shall be attended by the Union Representative and the employee and appropriate Company Representatives. The Company's answer to the grievance shall be made within ten (10) workdays following such meeting.

**STEP 3.  Written Submission of Grievance to Company Representative.**  If no settlement is reached, the Union Representative may immediately thereafter reduce a statement of the grievance to writing, which shall contain the following:

(a)  The detailed facts upon which the grievance is based.

(b)  References in the section(s) of the Agreement alleged to have been violated. (This will not be applicable in cases of dismissal or suspension for just cause, or of involuntary resignation.)

(c)  The remedy sought.

The Union Representative shall submit such written grievance to the designated Company Representative within five (5) workdays following receipt of the answer provided in Step 2 above. After such submission the designated Company Representative and the Union Representative may, within the next ten (10) workdays, meet and settle the grievance, and over their signatures indicate the disposition thereof. Otherwise, promptly after the expiration of such ten (10) day period they shall sign the grievance indicating that the grievance has been discussed and reconsidered by them and that no settlement has been reached, and the designated Company Representative will promptly thereafter confirm in writing to the Union Representative the denial of the grievance.

**STEP 4.  Arbitration.**  If no settlement is reached in Step 3 within the specified or agreed time limits, then either party may in writing, within ten (10) workdays thereafter, request that the matter be submitted to an arbiter for a prompt hearing as provided in 3.4 through 3.6.

**3.2(b)**  Employees shall not be discharged or suspended without just cause. An employee shall have the right to appeal a layoff, discharge, suspension, or involuntary resignation by filing a written grievance through the Union, beginning at Step 3, with the designated Company Representative within ten (10) workdays after the date of such layoff, discharge, suspension, or involuntary resignation.

**3.2(c)**  When the Union requests arbitration on behalf of bargaining unit employees who have been laid off, discharged, or suspended, or who have involuntarily resigned, the Company and the Union will exercise reasonable efforts to have the arbitration hearing within ninety (90) days of the request for arbitration.

**Section 3.3  Union Versus Company and Company Versus Union Grievances.**  Grievances which the Union may have against the Company or the Company may have against the Union, limited as aforesaid to matters dealing with the interpretation or application of terms of this Agreement, shall be handled as follows:

**3.3(a)**  Such grievances shall be submitted to the designated Company Representative or President of the Union, as the case may be, or to their designated representatives, within ten (10) workdays following the occurrence of the event giving rise to the grievance and shall contain the following:

(1)  Statement of the grievance setting forth in detail the facts upon which the grievance is based.

(2)  The section(s) of the Agreement alleged to have been violated.

(3)  The remedy sought.

**3.3(b)**  The grievance shall be signed by the President of the Union or the designated Company Representative, as the case may be, or their designated representatives. If no settlement is reached within ten (10) workdays from the submission of the grievance to the designated Company Representative or the designated representative of the Union, as the case may be, both shall sign the grievance and indicate it has been discussed and considered by them and that no settlement has been reached and the party responding to the grievance will promptly confirm in writing to the other party the denial of the grievance. Within ten (10) workdays thereafter either party may in writing request that the matter be submitted to an arbiter for a prompt hearing as provided in 3.4 through 3.6.

**3.3(c)**  No matter shall be considered as a grievance under this 3.3 unless it is presented to the designated persons within ten (10) workdays after occurrence of the last event on which the grievance is based.

2

3

**Section 3.4 Selection of Arbiter - from Arbitration Panel.** Contemporaneously with execution of this Agreement, the parties will agree upon a panel of five arbiters. The panel may thereafter be augmented upon the mutual agreement of the parties. Selection of an arbiter to hear a particular case shall be made from the panel on a rotating, alphabetical basis.

**Section 3.5 Selection of Arbiter - by Agreement.** Nothing in Section 3.4 shall preclude the parties from mutually agreeing on an arbiter to hear and decide a particular case.

**Section 3.6 Arbitration - Rules of Procedure.** Arbitration proceedings shall be in accordance with the following:

3.6(a) The arbiter shall hear and accept pertinent evidence submitted by both parties and shall be empowered to request such data as the arbiter deems pertinent to the grievance and shall render a decision in writing to both parties within sixty (60) days (unless mutually extended) of the completion of the hearing.

3.6(b) The arbiter shall be authorized to rule and issue a decision in writing on the issue presented for arbitration, which decision shall be final and binding on both parties.

3.6(c) The arbiter shall rule only on the basis of information presented in the hearing, and shall refuse to receive any information after the hearing except when there is mutual agreement, in the presence of both parties.

3.6(d) Each party to the proceedings may call such witnesses as may be necessary in the order in which their testimony is to be heard. Such testimony shall be limited to the matters set forth in the written statement of the grievance. The arguments of the parties may be supported by oral comment and rebuttal. Either or both parties may submit written briefs within a time period mutually agreed upon. Such arguments of the parties, whether oral or written, shall be confined to and directed at the matters set forth in the grievance.

3.6(e) Each party shall pay any compensation and expenses relating to its own witnesses or representatives.

3.6(f) The Company and the Union shall, by mutual consent, fix the amount of compensation to be paid for the services of the arbiter. The Union or the Company, whichever is ruled against by the arbiter, shall pay the compensation of the arbiter including necessary expenses.

3.6(g) The total cost of the stenographic record, if requested, will be paid by the party requesting it. If the other party also requests a copy, that party will pay one-half of the stenographic costs.

**Section 3.7 Binding Effect of Award.** All decisions arrived at under the provisions of this Article by the representatives of the Company and the Union, or by the arbiter, shall be final and binding upon both parties, provided that in arriving at such decisions neither of the parties nor the arbiter shall have the authority to alter this Agreement in whole or in part.

**Section 3.8 Time Limitation as to Back Pay.** Grievance claims regarding retroactive compensation shall be limited to thirty (30) calendar days prior to the written submission of the grievance to Company Representatives, provided, however, that this thirty (30) day limitation may be waived by mutual consent of the parties.

**Section 3.9 Extension of Time Limits by Agreement.** The time limits set forth in this Article are recognized by the parties as being necessary for prompt resolution of grievances. Reasonable extensions of these time limits may be arranged by mutual written agreement. If a decision is not rendered by the Company within the time limits established for Steps 1 and 2, Section 3.2, the Union may thereupon advance the grievance to the next step. Grievances not presented, or presented and not pursued, within the specified or mutually extended time limits will be considered waived.

4

**Section 3.10 Conferences During Working Hours.** All conferences resulting from the application of provisions of this Article shall be held during working hours.

**Section 3.11 Signing Grievance Does Not Concede Arbitrable Issue.** The signing of any grievance by any employee or representative of either the Company or the Union shall not be construed by either party as a concession or agreement that the grievance constitutes an arbitrable issue or is properly subject to the grievance machinery under the terms of this Article.

**Section 3.12 Jurisdictional Disputes.** Any disputes where the Union contends either (1) that work performed by represented employees not within one of the units described in Article 1 should be performed by employees within one of said units, or (2) that represented employees not within one of the units described in Article 1 should be included within one of said units, shall not be subject to the grievance and arbitration provisions of Article 3. This Section 3.12 shall not apply to such disputes where the Union obtains the written consent of all other interested bargaining representatives to participate in and be bound by the decision of an arbitrator or panel of arbitrators.

# ARTICLE 4
## PERFORMANCE MANAGEMENT

**Section 4.1 Performance Management Process.** The Union and the Company agree that many factors contribute to performance, including but not limited to customer satisfaction, continuous quality improvement, initiative, productivity, technical competence, communication, teamwork, innovation, creativity, integrity, and leadership. The Performance Management Process provides a continuous means for the employee and supervisor to assess performance; other means such as oral discussions, counseling and written comment also may be utilized. Performance problems warranting disciplinary action will be addressed through the established disciplinary process rather than through the Performance Management Process.

4.1(a) The Performance Management Process will be used by each employee and his or her supervisor, with the ultimate goal of improving individual and organization performance. Performance Management is designed to promote effective communication about performance and those factors that contribute to or are affected by performance, such as:

• job responsibilities;

• performance goals and expectations;

• an appraisal of performance, noting accomplishments and any areas requiring improvement;

• career development goals;

• the effect of performance on opportunities for selective salary adjustments;

• the effect of performance on retention index;

• any education and/or significant experience gained by the employee and related to his or her career progress within the Company;

• any other assignments, skills, or classifications where it is believed the employee may be particularly qualified;

• any unusual conditions that may impact work performance;

• and other factors relevant to assignment, performance, and contribution to the work effort.

5

agreement. The Union will be notified of the effective date and approximate duration. Employees will be assigned to such new work at no less than their current levels until the job family and level is made permanent. If the temporary job family code or level is made permanent at the higher level for the levels of the assigned employees, these employees will be paid within the range of the higher level for the time assigned to the work covered by this family or level. Effective upon and after the Company's determination that a temporary job family and/or level has become permanent, the provisions of 22.4 shall apply.

## Section 22.5 Individual Employee's Job Classifications.

**22.5(a)** It is a mutual objective of the Union and the Company that the job classification of each employee be an accurate and timely reflection of the work assigned and demonstrated capabilities of the employee. However, the Company shall retain the exclusive right to reassign employees as necessary to meet work requirements, and employees shall comply with such reassignments notwithstanding the employee's job classifications of record at the time. If the Company determines, by reference to the applicable job family description, that an employee's level is higher than is appropriate for the work to which the employee is assigned, the Company may permit the employee to continue in the same assignment without reclassification for whatever period of time the Company elects; or the Company may add to the employee's current assignment or reassign the employee to other work for which the employee's level is appropriate.

**22.5(b)** Because an employee may be assigned work at a level lower than the employee's current level without being reclassified to the lower level, the levels of work assignments of individual employees other than a grievant shall not be introduced or regarded as pertinent evidence for the purposes of 3.6(a), unless by mutual agreement of the parties.

**22.5(c)** Employees may be reclassified to a higher level irrespective of their assigned retention index.

**22.5(d)** **Challenges Concerning Individual Employee's Job Classification, Level, or Skills Management Code.** An individual employer may challenge his or her job family, level, or skills management code, within the limitation stipulated in 22.5(d)(1), based on the contention that the work assigned by the Company differs from the job family, responsibility level guide, and skills management code descriptions identified with such job classification, level, or skills management code to the extent and in such a manner as to warrant reclassifying the employee to a different existing job classification. Disputes based on such contentions may be processed as grievances in accordance with Article 3, and shall be resolved (whether by agreement or arbitration) exclusively by comparison of existing job family, responsibility level guide, and skills management code descriptions to determine which is more appropriate for the individual work assignment in dispute. Major job responsibilities contained on the grievant's Performance Management forms as provided in Article 4 shall be considered, along with other grievant job assignment information, in resolving individual job classification challenges. Major job responsibilities on Performance Management forms of other than the grievant may be considered only when such is mutually agreed upon by the Company and the Union.

**22.5(d)(1)** Short-term variations will from time to time occur in the amounts and types of work assigned to any activity, project, program or organization. Such variations, including, but not limited to, work assignment adjustments made necessary by vacations and other employee absences, are recognized by the Union and the Company as conditions which justify the short-term assignment of employees to work that is different than the employees' current job family classification or level. Accordingly, individual job family classification or level grievances acceptable under the provisions of this Article 22 are limited to assignments of not less than thirty continuous calendar days.

**22.5(d)(2)** If, subsequent to the processing of a grievance in accordance with 22.5(d) and 22.5(d)(1), it is determined by the Company or an arbiter that an existing higher level is appropriate, the Company will classify the employee and pay the employee at a rate that is

38

---

within the range of the appropriate level for the time the employee has performed the work at the higher level subsequent to the date on which the written grievance was received by the Company and within thirty calendar days prior to that date.

## ARTICLE 23
## DURATION

### Section 23.1 Duration.

**23.1(a)** This Agreement shall become effective March 20, 2000, and shall remain in full force and effect until the close of December 1, 2002, and shall be automatically renewed for consecutive periods of one year thereafter, unless either party shall notify the other in writing, at least sixty days and not more than ninety days prior to December 1 of any calendar year, beginning with 2002, of its desire either (1) to amend this Agreement, or (2) to terminate this Agreement as of a date stated in such notice to terminate, which date shall be subsequent to such December 1 provided that, in any event, this Agreement shall expire at the close of December 1, 2007.

**23.1(b)** If either a notice to amend or a notice to terminate is timely given pursuant to 23.1(a), the parties agree to meet within thirty days thereafter for the purpose of negotiating an amendment to this Agreement or a new contract.

**23.1(c)** If a notice to amend is timely given pursuant to (1) of 23.1(a), either party may at any time thereafter notify the other in writing of its desire to terminate this Agreement as of a date stated in such notice to terminate, which date shall be subsequent to December 1 of the year in which such notice to amend is timely given and at least sixty days subsequent to the giving of such notice to terminate.

**23.1(d)** This Agreement and any amendment thereof pursuant to this Article shall continue in full force and effect until either (1) a new contract superseding it is consummated, (2) it is terminated by a notice to terminate timely given pursuant to clause (2) of 23.1(a) or 23.1(c), or (3) it expires, whichever shall first occur.

Signed at Seattle, Washington, and dated this 1st day of August, 2000.

**Society of Professional Engineering Employees in Aerospace**

By Craig Buckham

President

**The Boeing Company**

By _signature_

Director, Union Relations

39

March 5, 2001
01-070


Mr. Geoff Stamper, Director
Union Relations – SPEEA
The Boeing Company
P.O. Box 3707, MS 10-11
Seattle, WA 98124

**Re:** **Step 3 – Violation of the Collective Bargaining Agreement between The Boeing Company and the Society of Professional Engineering Employees in Aerospace (SPEEA) relative to recognition of representation at the High Desert Test Center in California**

Dear Mr. Stamper:

I write to request a third step grievance meeting for purposes of discussing the on-going, willful violation of the SPEEA/Boeing Collective Bargaining Agreements (CBAs). Specifically, management at the BHDAIT (EAFB and Palmdale) is ignoring the recognition language in both the Technical and Professional CBAs. At these facilities non-represented employees are being placed into positions that have traditionally been held by SPEEA-represented employees.

SPEEA has attempted to address this issue locally and the result has been local management's refusal to comply with the CBAs.

Please schedule the meeting as quickly as possible with Robin Fleming at - (206) 433-0995, extension 127.

**Remedy:**

We request that The Company immediately recognize all employees in positions designated as SPEEA represented per the CBAs as being represented by SPEEA.

Sincerely,

Charles Bofferding
Executive Director

RP:sem

EXHIBIT C



15205 52nd Avenue S  |  Seattle, WA 98188   |  (206) 433.0991  |  (800) 325.0811  |  FAX (206) 248.3990

June 4, 2003
03-174


Mr. Jeff Janders
Union Relations – SPEEA
The Boeing Company
P.O. Box 3707, MS 10-11
Seattle, WA  98124-2207

**RE:   Request for Arbitration - Recognition of Employees Working at Edwards Air Force Base (EAFB) and Palmdale (ref: Step 3 Letter 01-070 dated March 5, 2001)**

Dear Mr. Janders:

As you are aware, we have had numerous discussions regarding our firm belief that The Boeing Company was violating the recognition language contained in our Professional and Technical Collective Bargaining Agreements.  In fact, we have even discussed The Company's denial of our data requests to resolve this issue on at least 3 occasions.

SPEEA continues to assert that ALL engineers and technical workers employed at Edwards and Palmdale, performing work described in Article 11 of the Puget Sound Professional Unit and Technical Unit Collective Bargaining Agreements, are represented by SPEEA per Articles 1 of the same.  This is substantiated by the Memorandum Of Agreement signed by Phil Beatty on October 5th, 1976 that first recognized SPEEA as the collective bargaining agent for these employees.  We have attached a copy of the MOA for reference.

Given our history on this issue including the continuing denial of data requests to determine the details of the situation, we are now asking that Boeing either accept that the employees are SPEEA represented or accept this letter as our request for arbitration to resolve the matter in accordance with Article 3.

Sincerely,

Charles Bofferding
Executive Director


RP:sem
Enc.

EXHIBIT _12_

s o c i e t y    o f    p r o f e s s i o n a l    e n g i n e e r i n g    e m p l o y e e s    i n    a e r o s p a c e
L03_174rp
on the web: www.speea.org  |  email: speea@speea.org

## MEMORANDUM OF AGREEMENT

This Memorandum of Agreement is entered in resolution of the issues raised by two NLRB representation petitions filed by SPEEA, Cases Nos. 31-RC-3599 and 31-RC-3600.  Through those petitions SPEEA seeks to represent certain engineering and technical employees of the Company at Edwards AFB, California.

It is hereby agreed and understood between SPEEA and the Company as follows:

1.   The Company hereby recognizes SPEEA as the collective bargaining representative of the Company's engineering and technical employees assigned to Edwards AFB, except as otherwise provided herein.

2.   Section 1.1(a) of the parties' Engineering Bargaining Units agreement is hereby amended to include, after "Article 11", the phrase "and including those persons at Edwards AFB, California, identified by the Company--SPEEA Memorandum of Agreement dated October 5, 1976."

3.   Section 1.1(a) of the parties' Technical Employee Unit agreement is hereby amended to include, after "Appendix A attached hereto", the phrase "and including those persons at Edwards AFB, California, identified by the Company--SPEEA Memorandum of Agreement dated October 5, 1976."

4.   Company personnel at Edwards AFB shall not be covered by this Memorandum if they are on travel status, do not meet the classification criteria of the parties' respective Engineering Bargaining Units (Section 1.1(a)) and Technical Employee Unit (Section 1.1(a)) collective bargaining agreements, or are ineligible for SPEEA representation through this Memorandum as a matter of law respecting successorship or proper recognition.

5.   Effective October 5, 1976, employees covered by this Memorandum shall be deemed included in and covered by the present collective bargaining agreements, as noted above, for all purposes, except that:  (a) the provisions of Article 8 of each agreement shall be applied separately to Edwards AFB; and (b) an employee at Edwards AFB who has transferred there from a SPEEA-represented position in Washington, and who subsequently is surplused and expresses a desire to return to Washington, will be treated for purposes of eligibility for retention at Washington as though surplused from the Major Organization with which the employee was identified immediately prior to transfer to Edwards AFB and in accord with the retention provisions of the applicable agreement.

JUL - 2 2003

RECEIVED

SEM

The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

JUN 26

*BOEING*

Rich

June 19, 2003

Mr. Charles Bofferding
Executive Director
Society of Professional Engineering
Employees in Aerospace
15205 52nd Avenue South
Seattle, WA 98188

Re: SPEEA's Request for Arbitration – Representation of Employees at Edwards Air
Force Base and Palmdale

Dear Mr. Bofferding:

This will respond to your letter dated June 4, 2003, which we received on June 10.
You have requested arbitration regarding SPEEA's claim that "ALL engineers and
technical workers employed at Edwards and Palmdale ... are represented by
SPEEA." Your claim presents a question concerning representation within the
jurisdiction of the National Labor Relations Board. Accordingly, we are not amenable
to arbitration of this issue.

We are perplexed by the assertion in your June 4 letter regarding Boeing's
"continuing denial of data requests." We continue to believe that Boeing has provided
you with relevant, necessary information to determine whether there is a dispute
between Boeing and SPEEA. Over the past two years, we have informed you of the
categories of employees at the HDIAT who have, and have not, been treated as
represented by SPEEA. We have asked for an explanation of SPEEA's position if
SPEEA disagreed. We remain willing to continue this dialogue at your request.

Very truly yours,

Jeff Sanders
Union Relations